IN THE UNITED DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ALLIED LOMAR, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 1:14-CV-01078-SS |
| | § | |
| LONE STAR DISTILLERY, LLC d/b/a | § | |
| GARRISON BROTHERS DISTILLERY, | § | |
| and DOES 1 THROUGH 10, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE SAM SPARKS:

**I.      Introduction and Summary.**

The Plaintiff asks this Court to enjoin the sale of one of the finest whiskeys made in America, based on a federal trademark registration it holds for a mark it (1) has never used on a product sold in the United States, and (2) has not used on a product *anywhere* since 2005. Discovery is closed, and the uncontested facts show that the Defendant is entitled to summary judgment on three grounds.

First, the Plaintiff never established trademark rights enforceable against the Defendant because it never sold, or even obtained the right to sell, a product bearing the trademark at issue in the United States.

Second, any trademark rights enforceable in the United States the Plaintiff may have obtained were abandoned due to the Plaintiff's complete nonuse of the mark in commerce since 2005, long before this lawsuit was filed.

Third, because the Plaintiff only avoided cancellation of its trademark registration by

repeatedly telling the U.S. Trademark Office – falsely – that its use of the mark was "continuous" and "ongoing," its trademark registration should be cancelled.

## II.     The Uncontested Facts.

### A.     The Defendant Garrison Brothers Distillery.

Defendant Lone Star Distillery, LLC, d/b/a Garrison Brothers Distillery, is Texas' first and oldest whiskey distillery.   Dan Garrison, its founder, first dreamed of making straight bourbon whiskey in Texas some fifteen years ago.   He bought a working Hill Country ranch in 2004, formed an LLC in 2006, and began acquiring the necessary silos, cisterns, fermenting tanks, stills, barrel storage facilities and bottling equipment.   He was distilling bourbon by January 2008, using only local water and Texas-grown corn, wheat and barley.   Garrison is currently the Vice President of the American Craft Spirits Association, which has some 250 member distilleries.  Ex. 1 ¶¶ 1-2.

Garrison Brothers' first product, an early release called "The Young Gun," was first sold on March 2, 2010, Texas Independence Day.  In 2011, Garrison Brothers made its first release of its flagship product, "Garrison Brothers Texas Straight Bourbon Whiskey."  The distillery sells a new release every year.  From 2010 to 2016, Garrison Brothers' production of bourbon increased ten-fold.  The distillery has received high accolades and won many awards.  It is recognized as one of the finest craft distilleries in the country.  Ex. 1 ¶ 3.

Beginning in 2008, Garrison Brothers began setting aside particularly choice barrels of its flagship bourbon for special releases.   In April 2013, the distillery released an uncut and unfiltered version of its bourbon called "Garrison Brothers Cowboy Bourbon."  This was a limited release and is considered the distillery's finest product, selling for $119 and up per 375 ml bottle.  It quickly sold out.  The name "Cowboy Bourbon" continued the theme started

with the "Young Gun" release, evoking both the distillery's roots in Texas and the special release's barrel-proof strength – the way whiskey was served in Old West saloons.  In 2014, Jim Murray's *Whisky Bible* named Garrison Brothers Cowboy Bourbon the "American Micro Whiskey of the Year."  A second release came out in 2015, and likewise quickly sold out. Garrison Brothers plans continued limited releases of Garrison Brothers Cowboy Bourbon every two years.  Ex. 1 ¶ 4.

After the 2013 release of Garrison Brothers Cowboy Bourbon sold out, and after it was named Micro Whiskey of the Year by the *Whisky Bible*, Dan Garrison received a cease-and-desist letter from the Plaintiff's counsel accompanied by the Complaint in this lawsuit, alleging that Garrison Brothers was infringing the Plaintiff's trademark in "Cowboy Little Barrel." Despite years in the business, Garrison had never heard of a bourbon called "Cowboy Little Barrel."  His search of the Internet for any product sold under that name turned up nothing. Ex. 1 ¶ 5.  For good reason:  the Plaintiff had never sold "Cowboy Little Barrel" bourbon in the United States and had not sold any product under that name anywhere since at least 2005.

### B.   The Plaintiff Allied Lomar, Inc.

Unlike Garrison Brothers, the Plaintiff is not a distillery.  Although the Plaintiff alleges that it is "in the business of selling, marketing and distributing" distilled spirits, FAC ¶ 2, it does not manufacture any alcohol.  Instead, it purchases alcohol distilled by others, bottles it and adds its own label.  Ex. 2 at 24:11-17 (Palatella Depo.).  In some instances, it may blend different alcohol products together with coloring, flavorings or blending materials.  *See* 25 C.F.R. § 5.22(b)(4).

The Plaintiff claims that, prior to 2005, it purchased raw bourbon, called "juice," from Kentucky distillers, and then bottled and sold that bourbon under the name "Cowboy Little

Barrel." Ex. 2 at 23:15-18.  The Plaintiff's president, Marci Palatella, claims it sold "Cowboy Little Barrel"-branded bourbon in a variety of bottles and with a variety of labels in Japan and other countries in the early 2000s.  Despite repeated requests in discovery, the Plaintiff has not produced any business records documenting the amount or extent of these alleged non-U.S. sales. *Id*. at 20:16-21:3.

During discovery, however, the Plaintiff did admit two dispositive facts:  (1) it had never sold a single bottle of "Cowboy Little Barrel" in the United States; and (2) it had not bottled, labeled or sold a single bottle of "Cowboy Little Barrel" anywhere for over ten years.  *Id*. at 28:1-13.  All the Plaintiff has is a federal trademark registration, on which it asks this Court to enjoin the sale of an *actual* product made and sold in the United States.  But like its long-absent "Cowboy Little Barrel" bourbon, the Plaintiff's trademark registration is an illusion.  The Plaintiff's registration would have been automatically cancelled years ago, except the Plaintiff twice told the Trademark Office – falsely – that its use of the trademark was "continuous" and "ongoing" and twice filed outdated specimens purportedly showing current use, even though sales of "Cowboy Little Barrel" had ceased years before.  *See* Ex. 5 & 6.

### B.     Plaintiff's false statements to the Trademark Office.

On February 8, 2001, the Plaintiff filed a Section 1(a) application with the Trademark Office to register a trademark for "Cowboy Little Barrel" under International Class 33 (alcoholic beverages) for bourbon whiskey.  Ex. 3.  The Plaintiff claimed a first use in commerce date of August 31, 1995.  Because the Plaintiff sought a U.S. registration, it was asserting that the use was in commerce *in* the United States.  *See* 15 U.S.C. § 1127 (defining "commerce" as "all commerce which may be lawfully regulated by Congress").  Based on that assertion, the Trademark Office registered the mark on October 28, 2003.

### 1.    The False Section 8 Declaration.

Federal law requires the holder of a new trademark registration to file, before the end of the 6-year period after the registration date, a sworn Declaration of Use or Excusable Nonuse. 15 U.S.C. § 1058(a)(1).  That affidavit, commonly called a Section 8 declaration, must either (1) state that the mark is in use in commerce, identify the goods on which the mark is in use, and provide a specimen showing current use in commerce, or (2) state that the mark is not in use and "include a showing that any nonuse is due to special circumstances which excuse such nonuse and is not due to any intention to abandon the mark." 15 U.S.C. § 1058(b).  Failure to timely file a Section 8 declaration results in cancellation of the registration.  15 U.S.C. § 1058(a).

In discovery, the Plaintiff admitted that any foreign sales of "Cowboy Little Barrel" ended by 2005 at the latest and it had no United States sales at all.  Ex. 2 at 19:18-25, 27:21-25, 28:9-13, 100-01.  In fact, the Plaintiff admitted because "there hasn't been supply since we've had the trademark, we haven't been selling." *Id*. 60:7-10.  I

Nonetheless, on October 26, 2008, three years after the last bottle of "Cowboy Little Barrel" was sold, the Plaintiff filed a sworn declaration with the Trademark Office stating that:

> [t]he mark is in use in commerce on or in connection with the goods and/or services identified above, *as evidenced by the attached specimen(s) showing the mark as used in commerce.  The mark has been in continuous use in commerce for five (5) consecutive years after the date of registration*, or the date of publication under Section 12(c),[1] and is still in use in commerce.

Ex. 4 (emphasis added).  The Plaintiff submitted an undated photograph of a bottle of "Cowboy Little Barrel."  This statement was materially false in at least three ways:

- "Cowboy Little Barrel" had *not* been "in continuous use in commerce" for five consecutive years since registration of the mark on October 28, 2003.

- "Cowboy Little Barrel" was *not* "still in use in commerce."

---

[1] Section 12(c) governs intent-to-use trademark registrations, not at issue here.

- The specimen photo did *not* show the mark as currently "in use in commerce."

### 2.      The False 10-Year Renewal Declaration.

Federal law also requires a trademark owner to renew a registration during the year prior to the tenth anniversary of its registration date.  15 U.S.C. § 1059(a).  Renewal requires filing a sworn Section 8 declaration attesting to continued use of the trademark in commerce or special circumstances that excuse nonuse of the trademark.  15 U.S.C. § 1059(a); § 1058(b).  Trademark registrations expire after ten years if not properly renewed.  15 U.S.C. § 1058(a); § 1059(a).

When the ten-year anniversary of the Plaintiff's trademark registration approached in October 2013, the Plaintiff still had not sold a single bottle of "Cowboy Little Barrel" in the United States.  Ex. 2 at 76:6-13.  It had not sold a bottle anywhere for eight years.  Nonetheless, the Plaintiff again told the Trademark Office on October 1, 2013, that the "Cowboy Little Barrel" trademark was "in use in commerce."  Ex. 4.  As "proof" of its continued use in commerce of the trademark, the Plaintiff filed the same photograph of a single bottle it had filed in 2008.  *Id*.

## III.    Grounds for Summary Judgment.

The Plaintiff asserts two causes of action – Trademark Infringement (15 U.S.C. § 1114) and Unfair Competition (15 U.S.C. § 1125(1)(A)) – plus two counts seeking relief under 15 U.S.C. § 1125(a).  Both causes of action are based on the allegation that the Garrison Brothers Cowboy Bourbon name infringes the Plaintiff's alleged trademark rights in "Cowboy Little Barrel."

To prove Trademark Infringement, the Plaintiff must show the Defendant (1) without the Plaintiff's consent (1) used in commerce (2) a reproduction, counterfeit, copy or colorable imitation of (3) the Plaintiff's registered trademark; (4) in connection with the sale, offering for

sale, distribution or advertising of any goods; (5) where such use is likely to cause confusion or mistake, or to deceive.  15 U.S.C. § 1114(1).

To prove Unfair Competition, the Plaintiff must prove the Defendant (1) in connection with any goods or services (2) used in commerce (3) a word, term, name, symbol, or device, false designation of origin or other false or misleading statement of fact that (4) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association with the Plaintiff as to the origin, sponsorship or approval of the Defendant's goods.  15 U.S.C. § 1125(a)(1)(A).  Because the Plaintiff's unfair competition claim is based on its alleged trademark rights in "Cowboy Little Barrel," it must establish (1) a protectable trademark and (2) a likelihood of consumer confusion between the parties' products.  *Two Pesos, Inc. v. Taco Cabana*, 505 U.S. 763, 767 n.4 (1992).

The Defendant moves for summary judgment on both claims and the related counts for relief because the Plaintiff cannot prove two essential elements of its claims:  (1)  protectable trademark rights and (2) likelihood of confusion.

### A.    The Plaintiff never sold or obtained the right to sell "Cowboy Little Barrel" bourbon in the United States.  Thus, it has no domestic trademark rights and cannot show a likelihood of confusion as to the Defendant's product.

This case is unique – and uniquely situated for summary judgment – because it is undisputed the Plaintiff never sold or obtained the right to sell any "Cowboy Little Barrel" bourbon in in the United States and ended any sales no later than 2005.

A legal prerequisite to bottling or removing liquor from a distillery is obtaining a Certificate of Label Approval ("COLA") from the United States Treasury's Alcohol and Tobacco Tax Bureau.  27 C.F.R. § 5.5(a).  While the Plaintiff claims it had the legal right, without a COLA, to have its product bottled and labeled in Kentucky, transported to California,

and marketed from California to foreign customers, it does not claim that a single bottle of "Cowboy Little Barrel" was ever legally sold to a United States consumer.  The only alleged sales – which the Plaintiff admits had ceased by 2005 – were to distributors for sale overseas. The Plaintiff did not even apply for a COLA until 2015, *after* it learned about Garrison Brothers Cowboy Bourbon, *after* it filed this lawsuit, and *after* the Defendant moved to dismiss the Plaintiff's claims on that basis.[2]

Trademark law is territorial; that is, trademark rights are developed by using the trademark in commerce in a given territory.  *Ingenohl v. Walter E. Olsen & Co.*, 273 U.S. 541, 544 (1927); *Fuji Photo Film Co. v. Shinohara*, 754 F.2d 591, 599 (5th Cir. 1985).  Unlike patent registration, trademark registration does not create trademark rights; such rights must exist independent of the application and are created through *actual use* of the mark in commerce.

> The owner of a trade-mark may not, like the proprietor of a patented invention, make a negative and merely prohibitive use of it as a monopoly.  ... .  [A] trade-mark confers no monopoly whatever in a proper sense, but is merely a convenient means for facilitating the protection of one's good-will in trade by placing a distinguishing mark or symbol – a commercial signature – upon the merchandise or the package in which it is sold.  It results that the adoption of a trade-mark does not, at least in the absence of some valid legislation enacted for the purpose, project the right of protection in advance of the extension of the trade, or operate as a claim of territorial rights over areas into which it thereafter may be deemed desirable to extend the trade.

*United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 98 (1918) (citations omitted).  That is, trademark rights extend only "wherever the trade goes, attended by the use of the mark."  *Id*.

If the Plaintiff, in fact, sold "Cowboy Little Barrel" bourbon to consumers in Japan, it may have developed enforceable trademark rights in Japan, where Garrison Brothers Cowboy Bourbon is not sold.  However, having admitted no sales to consumers in the United States, it is doubtful the Plaintiff created any enforceable trademark rights in the United States.

---

[2] The Plaintiff's claim that its use in commerce was continuing and ongoing because it was doing some level of marketing or advertising that was viewable by domestic customers, *see* Ex. 2 at 128, is belied by the fact that it was legally prohibited from selling to U.S. customers.

> [A] prior use of a trade-mark in a foreign country [does] not entitle its owner to claim exclusive trade-mark rights in the United States as against one who in good faith had adopted a like trade-mark here prior to the entry of the foreigner into this market.

*United Drug Co.*, 248 U.S. at 100-01; *Fuji Photo Film Co*, 754 F.2d at 546 ("It is well settled that foreign use is ineffectual to create trademark rights in the United States."). The Plaintiff does not, and cannot, claim that "Cowboy Little Barrel" brand was so famous overseas that it developed good will with United States customers. *See Grupo Gigante S.A. de C.V. v. Dallo & Co.*, 391 F.3d 1088 (9th Cir. 2002) (famous Mexican grocery store chain established trademark rights enforceable in San Diego where it had thousands of U.S. customers who shopped at its store in Tijuana).

And even if its alleged sales to foreign distributors for sales to overseas customers created some thin trademark protection in the United States, the Plaintiff cannot – as a matter of law – establish any likelihood of confusion among United States consumers, an essential element of its claims. 15 U.S.C. § 1114(1); § 1125(a)(1)(A). Because "Cowboy Little Barrel" was not (and could not be) sold in the United States prior to the release Garrison Brothers Cowboy Bourbon (or since), the Plaintiff cannot prove likelihood of confusion with Garrison Brothers Cowboy Bourbon. Given the complete absence of U.S. sales, it is simply not possible that domestic consumers would associate "Cowboy Little Barrel" with the Plaintiff; the Plaintiff has no good will associated with that brand in the United States. It therefore cannot prove that a consumer would be likely to confuse Garrison Brothers Cowboy Bourbon, a bourbon sold exclusively within the United States, with a product that has never been sold domestically. *Filipino Yellow Pages, Inc. v. Asian Journal Pubs., Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999).[3]

---

[3] To the extent the Plaintiff falls back on its sales to distributors as the basis for establishing U.S. trademark rights and good will, the Plaintiff does not, and cannot, allege that distributors would be likely to be confused that the source of Garrison Brothers Cowboy Bourbon is the Plaintiff. The Plaintiffs' unproven assertion that distributors believe consumers *would be* confused if "Cowboy Little Barrel" were

**B.      Any trademark rights the Plaintiff might have gained by shipping "Cowboy Little Barrel" overseas have been abandoned.**

While it is doubtful the Plaintiff ever obtained any domestic trademark rights, whatever thin rights it may have gained by shipping bottles overseas were abandoned long before Garrison Brothers Cowboy Bourbon was released in 2013 – thereby defeating any claim of infringement as a matter of law.

**1.      The Plaintiff's mark is legally presumed abandoned as of 2008.**

The basic rule of trademark law is "Use it or lose it."  *See* McCarthy on Trademarks § 17:9 at 17-12.  "It is the actual use of a symbol as a 'trademark' in the sale of goods which creates and builds up rights in a mark."  *Id*.  Therefore, "lack of actual use of a symbol as a 'trademark' can result in a loss of legal rights," known as abandonment.  *Id*.

> *If No Trade, Then No Trademark.*  When a business or product symbolized by a mark ceases its activities or sales, the good will of that mark immediately begins to fade.  If sales cease long enough, there may be no good will left which a mark would symbolize. …  Thus, if for any reason, the good will of a business or product comes to end, there is nothing left for a mark to symbolize.  Such a mark should be officially declared 'abandoned.'

McCarthy on Trademarks § 17:14 at 17-27.

This rule is so strong that the law presumes abandonment after three years of nonuse in commerce.  15 U.S.C. § 1127 ("Nonuse for 3 consecutive years shall be prima facie evidence of abandonment.").  "Use in commerce" means "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark."  15 U.S.C. § 1127.  To overcome a presumption of abandonment, the claimant must demonstrate a bona fide intent to resume use in each successive three-year period of nonuse, of which there were at least three in this case.  *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 149 n.9 (2nd Cir. 2007).  Once prima facie abandonment is

---

sold in the United States is both hearsay and speculative, given the absence of any prior sales, consumer surveys or other evidence showing a likelihood of consumer confusion.

shown, a claimant's original intent to abandon is irrelevant; it must then prove an intent *to resume use* to preserve its rights.  *Exxon Corp. v. Humble Exploration Co.*, 695 F.2d 96, 102 (5th Cir. 1983)

The Plaintiff admitted in discovery it has not filled, labeled or shipped a single bottle of "Cowboy Little Barrel" since 2004 – eleven years before it brought this lawsuit and nine years before the first release of Garrison Brothers Cowboy Bourbon.   Its trademark is therefore presumed abandoned, shifting the burden to the Plaintiff to prove that eleven continuous years of nonuse did not constitute abandonment.  15 U.S.C. § 1127.  To do so, the Plaintiff must prove both a valid reason for nonuse and an intent to resume use.  *E. Remy Martin & Co v. Shaw Ross Intern. Imports, Inc.*, 756 F.2d 1525, 1532 (11th Cir. 1985); *Empressa Cubana del Tabaco v. Culbro Corp.*, 213 F. Supp.2d 247, 271 (S.D.N.Y. 2002).  Use of a mark in a foreign country is no evidence of an intent to use that mark in the United States.  *Boulle, Ltd. v. De Boulle Diamond & Jewelry, Inc.*, No. 3:12-CV-1462-L(BF), 2014 WL 4413601, *11 (N.D. Tex. July 31, 2014); McCarthy on Trademarks § 17:3 at 17-4.

An intent to resume use requires objective evidence of "concrete plans … to resume use" in the "reasonably foreseeable future when the conditions requiring suspension abate."  *Rivard v. Linville*, 133 F.3d 1446, 1449 (Fed. Cir. 1998).  *See also Buck v. Palmer*, No. A-08-CA-572-SS, 2013 WL 11323280, at *4 (W.D. Tex. July 10, 2013) (Vague statement of intent to resume use "does not rise to the level of objective hard evidence of actual concrete plans to resume use.").  The "hard evidence" must show an intent to resume use during the initial three-year period of nonuse; later efforts to dust off and use a dormant mark will not avoid abandonment.  *Buck*, 2013 WL 11323280 at *3 (quoting *ITC Ltd.*, 482 F.3d at 149 n.9).

Simply *asserting* an intent to resume use carries little or no weight and will not prevent abandonment. *Exxon Corp. v. Humble Exploration Co.*, 695 F.2d 96, 99 (5th Cir. 1983). Rather, the parting asserting trademark ownership must prove activities "a reasonable businessman, who had a bona fide intent to use the mark in United States commerce, would have taken." *Silverman v. CBS, Inc.*, 870 F.2d 40, 47 (2nd Cir. 1989). The law does not permit "warehousing" unused trademarks. *Exxon Corp.*, 695 F.2d at 100-01. *See also Ambrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, (11th Cir. 1986) ("Trademark rights flow from use, not from intent to protect rights. … The Lanham Act does not permit such warehousing of trademarks.").[4] Once trademark rights are lost due to a three-year period of abandonment, they cannot be regained by subsequent use. *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1550 (11th Cir. 1986).

### 2. The Plaintiff has no excuse for eleven years of nonuse.

During eleven years of nonuse, the Plaintiff conducted, at most, a trademark maintenance program, not bona fide use in commerce. While it filed (false) declarations of use to prevent its registration from being cancelled, it had no marketing plan, did little or no advertising, produced no product and made no sales. Ex. 2 at 43:4-20. This is insufficient to avoid abandonment or show intent to resume use. *See La Societe Anonyme des Parfumes LeGalion v. Jean Patou, Inc.*, 495 1265, 1273 (2nd Cir. 1974).

In an effort to overcome the legal presumption of abandonment, the Plaintiff claims it could not produce any "Cowboy Little Barrel" because there was no wholesale bourbon for purchase anywhere between 2005 and 2015. This is not true; suppliers offered to sell Dan Garrison wholesale bourbon when he was launching his distillery. Ex. 1 ¶ 6. Even if such a shortage had occurred, it would not save the Plaintiff's registration from abandonment.

---

[4] The Plaintiff holds at least 25 trademark registrations, many of which are currently unused. Ex. 2 at 14:6-16:16, 18:10-19:5.

First, in 2008 and 2013 – during the alleged bourbon shortage – the Plaintiff told the Trademark Office it was, and had been, continuously using "Cowboy Little Barrel" on bourbon bottles in commerce.   Twice, it submitted a picture of a bourbon bottle as evidence of its continued use in commerce.   If the Plaintiff had not made these statements, its trademark registration would have been cancelled.  15 U.S.C. § 1058(a); § 1059(a).

The Plaintiff could have told the Trademark Office the truth and still retained its trademark, if it could establish a valid reason for its extended years of nonuse:

> If the registered mark is not in use in commerce on or in connection with all the goods, services, or classes specified in the registration, [the registrant must] *set forth the date when such use of the mark in commerce stopped and the approximate date when such use is expected to resume; and recite facts to show that nonuse as to those goods, service, or classes is due to special circumstances that excuse the nonuse* and is not due to an intention to abandon the mark … .

37 C.F.R. § 2.161(f)(2) (emphasis added).  *See also* Trademark Manual of Examining Procedure § 1604.1 ("The affidavit or declaration must state when use in commerce stopped [and] should also specify the reason for nonuse, the specific steps being taken to put the mark back in use, and any other relevant facts to support a finding of excusable nonuse.").

The Plaintiff had two opportunities to tell the Trademark Office the truth – that it had not used the "Cowboy Little Barrel" mark since 2005 – and to offer up an excuse for its nonuse.  It did not.  Instead, it falsely claimed continuous and ongoing use.  Now, with its nonuse exposed and its registration challenged, the Plaintiff invents a ten-year bourbon drought.  However, it maintained its registration only by repeatedly filing in the Trademark Office a picture of a full bottled of bourbon as evidence of ongoing use in commerce.  It cannot now defeat abandonment and seek remedies against the Defendant by telling this Court the exact opposite.  *Smith International, Inc. v. Olin Corp.*, 209 U.S.P.Q. 1033, 1981 WL 48127, *7 (T.T.A.B. 1981) ("[W]illful withholding from the Patent and Trademark Office by an applicant or registrant of

material information or facts which, if disclosed to the Office, would have resulted in the disallowance of the registration sought or to be maintained.").

Moreover, even if the Plaintiff had told the Trademark Office about The Great Bourbon Shortage of 2005-2015, this would not have excused its nonuse. Neither decreased demand for a product nor "nonuse due to ordinary changes in social or economic conditions" excuses nonuse of a trademark. Trademark Manual of Examining Procedure § 1604.1. Vagaries in the marketplace do not excuse nonuse or avoid abandonment.

For example, in *In re Moorman Mfg. Co.*, 203 U.S.P.Q 712, 1979 WL 24864 (T.T.A.B. 1979), a registrant sought renewal despite nonuse of a mark, claiming that the lack of an essential ingredient, which came from a single source, excused its nonuse. The Trademark Examiner denied the renewal, which the Assistant Commissioner affirmed, explaining

> According to the terms of Section 8, the affidavit must contain a "showing" of excusable nonuse. That is to say, sufficient facts must be set forth to demonstrate clearly that nonuse is due to circumstances beyond the registrant's control. Such a showing has not been made in the present case. Petitioner asserts that an essential ingredient of its trademarked product has not been available from its accustomed commercial source and that it has been negotiating to obtain a new source; but petitioner has not indicated the reasons for its inability to conclude successfully its negotiation for the required raw material other than to indicate that it cannot find a new source that is commercially "feasible." Moreover, petitioner has not indicated what actions, if any, it has taken to promote the mark in the interim. In light of over five years' nonuse of the mark, petitioner has failed to show that its withdrawal from the market is temporary.

1979 WL 24864, *2.

The same reasoning applies here. The Plaintiffs' dubious claim that it was unable to find wholesale bourbon for more than ten years (twice the period of nonuse in *Moorman Mfg.*) does not excuse its nonuse of the "Cowboy Little Barrel" mark.

**C.    Plaintiff's trademark registration should be cancelled due to abandonment and fraud on the Trademark Office.**

A District Court may cancel a trademark registration due to abandonment or fraud on the Trademark Office.  15 U.S.C. § 1119 ("In any action involving a registered mark the court may determine the right to registration [or] order the cancelation of registrations … .").

**1.    Abandonment.**

As shown in Section II.B., above, the Plaintiff's trademark is presumed abandoned as of 2008, and the Plaintiff cannot excuse eleven years of nonuse.  This Court has the power to cancel trademarks for non-use.  15 U.S.C. § 1119.  Because the Plaintiff's trademark was abandoned, the Defendant is entitled to summary judgment of cancellation of its trademark.

**2.    Fraud.**

In addition, a registration may be cancelled upon a showing, by clear and convincing evidence, that the registrant made false declarations to the Trademark Office with intent to deceive.  *Meineke Discount Muffler v. Jaynes*, 999 F.2d 120, 125 (5th Cir. 1993).  Intent to deceive may be inferred from false declarations filed with the Trademark Office, particularly when the registration has no credible explanation for its misrepresentation or failure to disclose material information.  *Bruno Independent Living Aids, Inc. v. Acorn Mobility Services, Ltd.*, 394 F.3d 1348, 1354-55 (Fed. Cir. 2005).  The more material the misrepresentation, the lower showing of intent needed.  *Bristol-Myers Squibb Co. v. Rhone Poulenc Rorer, Inc.*, 326 F.3d 1226 (Fed. Cir. 2003).  The failure to correct misrepresentations, even innocently made, constitute fraud if the registrant learns of the misrepresentations, benefitted from them, and knows the Trademark Office relied on them in issuing or renewing a registration.  *Space Base, Inc. v. Stadis Corp.*, 17 U.S.P.Q.2d 1216 (T.T.A.B. 1990).

In a case directly on point, the Federal Circuit affirmed the cancellation, on summary judgment, of a trademark registration based on the registrant's false assertion of continued use in commerce to the Trademark Office.  *Torres v. Torresella*, 808 F.2d 46 (Fed Cir. 1986).   In *Torres*, the plaintiff had registered a mark "Las Torres" for wine, vermouth and champagne.  The plaintiff then dropped "Las" from the label, and limited its use of "Torres" to wine.  When the plaintiff filed his affidavit to renew the trademark registration, he claimed the mark was still used for wine, vermouth and champagne.  In affirming the District Court's cancellation of the mark, the Federal Circuit wrote:

> If a registrant files a verified renewal application stating that his registered mark is currently in use in interstate commerce and that the label attached to the application shows the mark as currently used when, in fact, he knows or should know that he is not using the mark as registered and that the label attached to the registration is not currently in use, *he has knowingly attempted to mislead the PTO*.

*Id*. at 49.

This is precisely what the Plaintiff did, not once, but twice, when it submitted verified affidavits claiming that it was using the "Cowboy Little Barrel" label when, in fact, it was not. Its registration should therefore be cancelled.

**IV.    Conclusion.**

The undisputed facts show that the Plaintiff cannot raise a material issue as to its inability to prove two essential elements of its claims:  (1) ownership of trademark rights and (2) that sale of the Defendant's product in the United States is likely to cause consumer confusion as to its origin.  The same uncontested facts also raise the presumption that the Plaintiff abandoned any trademark rights it may have had in the United States long before the Defendant released Garrison Brothers Cowboy Bourbon, thereby defeating any claim of infringement and entitling the Defendant to have the Plaintiff's trademark registration cancelled.

For these reasons, this Court should grant summary judgment for Defendant Lone Star Distillery, LLC, and dismiss all of the Plaintiff's claims against it with prejudice, cancel the Plaintiff's trademark for "Cowboy Little Barrel," and award the Defendant its fees and costs of court, and such further and other relief to which the Defendant may be justly entitled.

Respectfully submitted,

BURT BARR & ASSOCIATES, L.L.P.

By:     /s/ M. Forest Nelson
        John Holman Barr
        SBN: 01798700
        M. Forest Nelson
        SBN: 14904625
        P. O. Box 223667
        Dallas, Texas  75222-3667
        (214) 943-0012
        (214) 943-0048 Fax
        jbarr@bbarr.com
        fnelson@bbarr.com


By:     /s/ Steven D. Smit
        Steven D. Smit
        SBN: 18527500
        Peter D. Kennedy
        SBN: 11296650
        Graves, Dougherty, Hearon & Moody, P.C.
        401 Congress Avenue, Suite 2200
        Austin, Texas 78701
        (512) 480-5653
        (512) 480-5853 Fax
        ssmit@gdhm.com
        pkennedy@gdhm.com

        ATTORNEYS FOR LONE STAR
        DISTILLERY, LLC DBA GARRISON
        BROTHERS DISTILLERY

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2016, the forgoing was served via the Court's CM/ECF notification system on:

Robert P. Andris                        **Via ECF**
Michael D. Kanach
Gordon & Rees, LLP
275 Battery Street, Suite 2000
San Francisco, California 94111


Joshua P. Martin                        **Via ECF**
Gordon & Rees, LLP
2100 Ross Avenue, Suite 2800
Dallas, Texas 75201

Steven D. Smit                          **Via ECF**
Graves, Dougherty, Hearon & Moody
401 Congress Avenue, Suite 2200
Austin, Texas 78701


  /s/ M. Forest Nelson
M. Forest Nelson

**EXHIBITS IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

1.      Declaration of Daniel Garrison

2.      Excerpts from Deposition of Allied Lomar, Inc.

3.      Application to Register "Cowboy Little Barrel" (excerpt from Palatella Depo. Exhibit 3).

4.      Trademark Registration for "Cowboy Little Barrel."

5.      Combined Declaration of Use and Incontestibility under Sections 8 & 15 (Palatella Depo. Exhibit 6).

6.      Combined Declaration of Use and/or Excusable Nonuse/Application for Renewal of Registration of a Mark under Sections 8 & 9 (Palatella Depo. Exhibit 7).

# EXHIBIT 1

Exhibit 1 - Page 1 of 2

IN THE UNITED DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ALLIED LOMAR, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 1:14-CV-01078-SS |
| | § | |
| LONE STAR DISTILLERY, LLC d/b/a | § | |
| GARRISON BROTHERS DISTILLERY, | § | |
| and DOES 1 THROUGH 10, | § | |
| | § | |
| Defendants. | § | |

**DECLARATION OF DANIEL GARRISON**

1.       My name is Daniel ("Dan") Garrison.  I am over the age of eighteen (18) years, have never been convicted of a felony, and am otherwise competent to give this declaration.

2.       I am the founder of Garrison Brothers Distillery and the manager of Defendant Lone Star Distillery, LLC.

3.       Lone Star Distillery, LLC, d/b/a Garrison Brothers Distillery, is Texas' first and oldest whiskey distillery.  I am its founder.  I first dreamed of making straight bourbon whiskey in Texas about fifteen years ago.  I bought a working Hill Country ranch in 2004, formed an LLC in 2006, and began acquiring the necessary silos, cisterns, fermenting tanks, stills, barrel storage facilities and bottling equipment.  I was distilling bourbon by January 2008, using only local water and Texas-grown corn, wheat and barley.  I am currently the Vice President of the American Craft Spirits Association, which has some 250 member distilleries.

4.       Garrison Brothers' first product, an early release called "The Young Gun," was first sold on March 2, 2010, Texas Independence Day.  In 2011, Garrison Brothers made its first release of its flagship product, "Garrison Brothers Texas Straight Bourbon Whiskey."   The

Exhibit 1 - Page 1 of 2

distillery sells a new release every year. From 2010 to 2016, Garrison Brothers' production of bourbon increased ten-fold. The distillery has received high accolades and won many awards. It is recognized as one of the finest craft distilleries in the country.

5.     After the 2013 release of Garrison Brothers Cowboy Bourbon sold out, and after it was named Micro Whiskey of the Year by the *Whisky Bible*, I received a cease-and-desist letter from a lawyer for the Plaintiff, Allied Lomar, Inc.. The letter alleged that Garrison Brothers was violating the Plaintiff's trademark in "Cowboy Little Barrel." Despite years in the business, I had never heard of a bourbon called "Cowboy Little Barrel." I searched the Internet for any actual bourbon or other alcoholic beverage sold under that name, but found nothing. To my knowledge, "Cowboy Little Barrel" bourbon has never been sold in the United States.

6.     I am not aware of any ten-year wholesale bourbon shortage in the United States from the early 2000s until the mid-2010s. When I was launching my distillery, numerous distilleries offered to sell me wholesale bourbon.

7.     I declare under penalty of perjury that the foregoing facts are true and correct. Executed June 12, 2016.

Daniel ("Dan") Garrison

2

Exhibit 1 - Page 2 of 2

# EXHIBIT 2

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF TEXAS

3                     AUSTIN DIVISION

4      _____

5      ALLIED LOMAR, INC.,              )
                                        )
6                                       )
                                        )
             Plaintiffs,                )
7          vs.                          ) Case No. 1:14-CV-01078-SS
                                        )
8      LONE STAR DISTILLERY,            )
       LLC D/B/A GARRISON               )
9      BROTHERS DISTILLERY,             )
                                        )
10             Defendants.              )
       _____)

11

12

13            VIDEO DEPOSITION OF MARCI PALATELLA

14               San Francisco, California

15                Monday, June 6, 2016

16                     Volume I

17

18

19

20

21     Reported by:
       JOANNA BROADWELL
22     CSR No. 10959
23     Job No. 2324953
24
25     PAGES 1 - 157

Page 2

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE WESTERN DISTRICT OF TEXAS

3                        AUSTIN DIVISION

4     _____

5     ALLIED LOMAR, INC.,            )
                                     )
6                                    )
                                     )
              Plaintiffs,            )
7          vs.                       ) Case No. 1:14-CV-01078-SS
                                     )
8     LONE STAR DISTILLERY,          )
      LLC D/B/A GARRISON             )
9     BROTHERS DISTILLERY,           )
                                     )
10             Defendants.           )
      _____)

11

12

13

14              Video deposition of MARCI PALATELLA,

15    Volume I, taken on behalf of Defendants, at 275 Battery

16    Street, Suite 2000,  San Francisco, California,

17    beginning at 8:29 a.m. and ending

18    at 12:12 p.m. on Monday, June 6, 2016,

19    before JOANNA BROADWELL, Certified Shorthand

20    Reporter No. 10959.

21

22

23

24

25

Exhibit 2

```
                                                      Page 3
  1    APPEARANCES:

  2

  3    For Plaintiffs:

  4       GORDON & REES, LLP

  5       BY: ROBERT P. ANDRIS

  6       Attorney at Law

  7       275 Battery Street, Ste. 2000

  8       San Francisco, California  94111

  9       (415) 986-5900

 10

 11

 12    For Defendants LONE STAR DISTILLERY LLC:

 13       BURT BARR & ASSOCIATES

 14       BY: M. FOREST NELSON

 15       Attorney at Law

 16       P.O. Box 223667

 17       Dallas, Texas  75222-3667

 18       (214) 943-0012

 19

 20

 21

 22

 23

 24

 25
```

Exhibit 2

                                              Page 4

1     (Continued Appearances - Page 2)

2

3     For Defendants GARRISON BROTHERS:

4         GRAVES, DOUGHERTY, HEARON & MOODY

5         BY: STEVEN D. SMIT

6         Attorney at Law

7         401 Congress Avenue, Ste. 2200

8         Austin, Texas  78701

9         (512) 480-5600

10

11    Also Present:  Sean Grant, Videographer and Dan

12    Garrison.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1

2

3                            INDEX

4    WITNESS                          EXAMINATION

5    MARCI PALATELLA

6    Volume I

7                        BY MR. NELSON                8

8

9                    INDEX OF EXHIBITS

10

11   NUMBER                  DESCRIPTION            PAGES

12   Exhibit 1               Defendant's First Amended Rule

13                           30(B)(6)Deposition Notice of

14                           Plaintiff Allied Lomar      10

15   Exhibit 2               * Collective Documents      12

16   Exhibit 3               * Correspondence File       12

17   Exhibit 4               Allied Lomar, Inc.'s Responses

18                           and Objections              32

19   Exhibit 5               * Allied Lomar, Inc.'s

20                           Supplemental Responses and

21                           Objections                 124

22   Exhibit 6               Combined Declaration of Use and

23                           Incontestability Under

24                           Sections 8 & 15            129

25

Exhibit 2

```
                                                      Page 6

 1     (Continued Exhibits - Page 2)

 2

 3     Exhibit 7               Combined Declaration of Use

 4                             and/or Excusable Nonuse/

 5                             Application for Renewal of

 6                             Registration of a Mark Under

 7                             Sections 8 & 9              129

 8

 9     Previously Marked Exhibits

10     None

11     * Bound separately and marked as Confidential.

12

13                         CERTIFIED QUESTIONS

14

15     Page 150, Line 5 to Line 7.

16

17

18

19

20

21

22

23

24

25
```

Exhibit 2

Page 7

1          San Francisco, California, Monday, June 6, 2016

2                              8:29 a.m.

3                             PROCEEDINGS

4          THE VIDEOGRAPHER:  Good morning.  We're on the

5     record.  The time is 8:29 a.m., and the date is

6     June 6th, 2016.  This begins the videotaped deposition

7     of Allied Lomar Inc. pursuant to Rule 30B6.  My name is

8     Sean Grant, here with our court reporter, Joanna

9     Broadwell.  We're here from Veritext Legal Solutions at

10    the request of counsel for defendant.

11         This deposition is being held at Gordon & Rees

12    LLP in San Francisco, California.  The caption of this

13    case is Allied Lomar Inc. versus Lone Star Distillery,

14    LLC, dba Garrison Brothers Distillery, Case No.

15    1:14-CV-01078-SS.

16         Please note that audio and video recording will

17    take place unless all parties have agreed to go off the

18    record.  Microphones are sensitive and may pick up

19    whispers, private conversations or cellular

20    interference.

21         At this time will counsel please identify

22    themselves and state whom they represent.

23         MR. NELSON:  Forest Nelson for the defendant.

24         MR. SMIT:  Steve Smit for the defendant.

25         THE VIDEOGRAPHER:  Also present?

Page 8

1          MR GARRISON:  Dan Garrison, Garrison Brothers.

2          MR. ANDRIS:  And Robert Andris here for

3     Plaintiff.

4          THE VIDEOGRAPHER:  Witness name?

5          THE DEPONENT:  Marci Palatella.  I am the

6     plaintiff.

7          THE VIDEOGRAPHER:  Will the certified court

8     reporter please swear in the witness.

9

10    MARCI PALATELLA,

11    having been administered an oath, was examined and

12    testified as follows:

13

14                    EXAMINATION

15    BY MR. NELSON:

16        Q    Please state your name for the record.

17        A    Marci Palatella.

18        Q    Ms. Palatella, you've given a deposition before,

19    correct?

20        A    Yes, I have.

21        Q    Have you ever testified in court before?

22        A    Not that I can recall, no.

23        Q    But you understand the import of a deposition,

24    correct?

25        A    Right.  I understand --

Exhibit 2

```
                                              Page 9
 1       Q    You understand that this is under penalty of
 2    perjury?
 3       A    Uh-huh.
 4       Q    You're going to have to make an audible response,
 5    Ms. Palatella.
 6       A    Yes.
 7       Q    You understand that this deposition is just like
 8    the information you supply to a government agency or you
 9    supply to anybody else associated with Allied Lomar,
10    correct?
11       A    Yes.
12       Q    You understand that according to what your
13    counsel has told us, you're the person who's here to
14    speak on behalf of Allied Lomar?
15       A    Yes.
16       Q    Did you have the opportunity to read the
17    interrogatories and request for production in this case?
18    Those are questions that we pose to you, answer the
19    questions and then produce documents for us.  Did you
20    have a chance to read those responses?
21       A    Is that the request that you gave my attorney
22    for --
23       Q    Correct.
24       A    -- discovery or whatever it's called?
25       Q    Yes, ma'am.
```

Page 10

```
 1      A   Yes.

 2      Q   All right.  And you understand that in the

 3  discovery response, your counsel said that you were the

 4  person who would provide all of the information, that

 5  any information that came from anybody else would be

 6  cumulative, but you were the one who had the personal

 7  knowledge of the operations of Allied Lomar at all

 8  material times?

 9      A   Yes.

10          THE REPORTER:  At all "material"...

11  BY MR. NELSON:

12      Q   "Times."  So you understand that, just as when

13  you submit information to the United States Patent and

14  Trademark Office or you submit information to the TTB

15  for a COLA as in this deposition --

16          THE REPORTER:  I'm sorry.  "To the TTB"...

17  BY MR. NELSON:

18      Q   TTB for COLA as in the deposition you've given

19  here and the deposition you gave in the Diageo case,

20  that you are the one who represents, you have personal

21  knowledge, and you're the one who's representing that

22  all of the information you supplied is true, accurate

23  and correct, correct?

24      A   To the best of my recollection.  Absolutely.

25          (Exhibit 1 was marked for identification
```

Page 11

1      by the court reporter and is attached hereto.)

2   BY MR. NELSON:

3      Q   If we could show you Exhibit No. 1, have you had

4   the opportunity to see that document or a similar

5   document?  This is the deposition notice.

6          MR. ANDRIS:  This is the one that has all of this

7   stuff, the topics.

8          THE DEPONENT:  Who issued this?

9          MR. ANDRIS:  They did.

10         THE DEPONENT:  Okay.

11  BY MR. NELSON:

12     Q   Could you read those topics and tell me that

13  you're going to be able and you're going to be the only

14  person to speak on each one of those topics?  Nobody

15  else is going to speak for Allied Lomar on those topics?

16     A   "The allegations in the above-captioned

17  action" -- Do you want me to read it out loud to you?

18         THE REPORTER:  A little slower for me.

19         THE DEPONENT:  Do you want me to read this out

20  loud or to myself?

21  BY MR. NELSON:

22     Q   To yourself.

23         THE REPORTER:  I'm sorry.  I need to write every

24  single word that we speak, so we're going to have speak

25  one at a time.

Exhibit 2

Page 12

```
1           THE DEPONENT:  Okay.  Okay.
2    BY MR. NELSON:
3       Q   Read it to yourself and just represent to me that
4    you are the person for Allied Lomar who's going to
5    answer each of these topics.
6       A   Got it.  Let me -- give me a moment.
7           THE VIDEOGRAPHER:  Your microphone fell off.
8    It's better if you put it on your jacket.
9           THE DEPONENT:  Not knowing what you're going to
10   ask me, I would assume I'd be able to answer most of
11   these.
12   BY MR. NELSON:
13      Q   Well, is there any topic that you believe you
14   would be unable to answer?
15      A   Broadly, no.  Specifically coming from you,
16   possibly.  I mean, I'm...
17      (Exhibit 2 was marked for identification
18       by the court reporter and is attached hereto.)
19      (Exhibit 3 was marked for identification
20       by the court reporter and is attached hereto.)
21   BY MR. NELSON:
22      Q   Now, if we could look at Exhibit No. 2.  My
23   assistant was kind enough to put these basically in
24   order from the questioning I'm going to ask you.
25      A   Okay.
```

Exhibit 2

Page 13

1      Q   And if you look at these documents, you will

2  notice on the documents at the bottom that there is a

3  number, the bottom right-hand corner.  Do you see the

4  number?

5      A   Uh-huh.  Uh-huh.

6      Q   I will try to make reference to the number so

7  that we can go along with it.  I will try to make my

8  questions generic.

9      A   Okay.

10      Q   So there won't be any disclosures that will --

11  that you will be able to make some request to have

12  Mr. Garrison leave.  Okay?

13      A   Uh-huh.

14      Q   Now, how long have you been in the distillery

15  business?

16      A   Distillery or distilling?

17      Q   Distillery --

18      A   Liquor and wine and --

19      Q   Distilled spirits.

20      A   In the distilled spirits and wine industry, about

21  30 years.

22      Q   Do you know of any other company that reserves

23  trade names similar to Allied Lomar?

24      A   What do you mean by "reserved"?

25      Q   Well, if we can take a look at the exhibit Allied

Page 14

1    5915, that's the first page.

2        A    Uh-huh.

3        Q    And you can take those things out of the sleeves.

4    My secretary put it in the sleeves so that --

5        A    It's okay.

6        Q    -- I wouldn't need to.  On this document -- and

7    this is dated September the 1st, 2015, there are 25

8    marks.  Do you see those, twenty-five trademarks?

9        A    No, I don't, because you've got them -- you don't

10   have them turned around.  You've got both of them in the

11   same sleeve.  Okay.  Okay.

12       Q    These are 25 -- these are 25 trademarks that are

13   held in the name of Allied Lomar, correct?

14       A    Yes, they are.

15       Q    Can you tell me out of these 25 names

16   approximately how many of them you are now selling

17   product in?

18       A    I'm going to answer you, and I'd like you to let

19   me complete my answer.  Okay?  I understand your role.

20   You need to understand mine.  There's been a whiskey

21   shortage for the last 10 or 11 years.  All of these

22   products we have sold, other than two which are fairly

23   new trademarks.  There hasn't been -- our whole premise

24   for our business was old and rare whiskey, and there

25   hasn't been any.  So some of these are not currently in

Exhibit 2

Page 15

1    the marketplace.

2        Q    I understand what you're saying, but you're -- if

3    I take your answer, you're saying that there hasn't been

4    bourbon in the market, correct?

5        A    There hasn't been the kind of bourbon that we

6    were producing, correct.

7        Q    A lot of these products are vodka and gin.  Are

8    you selling any of those products?

9        A    Where's the gin?

10       Q    If you look at the first page, there's a

11   trademark here of Acqua.

12       A    Acqua, yes.

13       Q    Are you selling in that market?

14       A    We have been selling it.

15       Q    Are you selling it today?

16       A    We don't have orders for it today, but we have it

17   on our price list and we've sold it historically.

18       Q    Blue Palm?

19       A    We don't have the product in the market today,

20   but we sold it historically.

21       Q    Immaculata?

22       A    Immaculata is a new trademark and it's part of

23   our tequila portfolio.

24       Q    Lost Barrel?

25            THE REPORTER:  I'm sorry.  Repeat it.

Exhibit 2

Page 16

1    BY MR. NELSON:

2        Q    Lost Barrel.

3        A    You know what?  Excuse me.  I'd like to ask that

4    Dan leave.

5        Q    Then I won't ask about that one.

6        A    Okay.

7             MR. SMIT:  The objection is whether or not you

8    sell the product?

9             THE DEPONENT:  How about that I have product in

10   process that's coming to market, and I feel it's

11   confidential and proprietary.

12   BY MR. NELSON:

13       Q    Jazz Club?

14       A    We don't currently have product in the market

15   today.

16            THE REPORTER:  Once again, please.

17            THE DEPONENT:  We do not have product in the

18   market today.  We have sold it historically.  Do not

19   have product in the market today.

20   BY MR. NELSON:

21       Q    Blues Club?

22       A    Same thing.  We've sold it historically.  There

23   hasn't been supply, and we do not have it in the market

24   today.

25       Q    Do you know any other company that holds this

Exhibit 2

```
                                            Page 17
 1    many trademarks without product in the market?

 2        A    Every major supplier.

 3        Q    Can you give me the name of just one company?

 4        A    Look up Diageo's trademarks and see how many they

 5    have and tell me how many of those products are actually

 6    in the marketplace today.

 7        Q    Any company besides Diageo?

 8        A    I don't know.  I don't snoop around in other

 9    people's trademarks.  But I'm not holding them.  They're

10    my trademarks to use, which I do use.

11        Q    Do you know any other people who are selling

12    products similar to these trademarks?

13        A    At this time, yes.

14        Q    Do you know any people that sold these products

15    before you offered the trademarks?

16        A    No.

17        Q    Now, on these 25 trademarks, do you file the

18    necessary papers with the TTB associated with COLA?

19        A    When they're ready to be released in the domestic

20    market.  I follow all of rules.

21        Q    So if we went onto the TTB site --

22        A    Uh-huh.

23        Q    We would be able to find information regarding

24    your filings for each one of these trademarks?

25             THE REPORTER:  I'm sorry.  "Regarding your"...
```

Page 18

1    BY MR. NELSON:

2        Q    Regarding these 25 trademarks?

3        A    No, they're only required if I sell them here in

4    the domestic market.

5        Q    Out of these 25 trademarks, how many have you

6    sold in the foreign market and not in the domestic

7    market?

8        A    Most of these are coming into the domestic

9    market.

10       Q    Over the last 10 years, can you tell me which one

11   of these trademarks you've sold product --

12       A    In the last 10 years there's been a dramatic

13   bourbon and whiskey shortage which is well documented.

14   So I have not been able to get -- I don't make bourbon

15   and whiskey myself yet, and I have not been able to get

16   supply.

17       Q    Well, can you name just one of these in the last

18   20 -- in the last 10 years that you've sold out of these

19   25 markets?

20            MR. ANDRIS:  I think that's been answered.  Asked

21   and answered.

22            MR. NELSON:  I think her answer was she hasn't

23   been able to get bourbon.

24   BY MR. NELSON:

25       Q    Can you tell me, out of these 25, are there any

Page 19

1    of these that you've sold in the last 10 years, any of

2    the product?

3        A    I have orders -- yes, absolutely.  The ones that

4    are non-bourbon.  Campion tequila, and we have orders

5    right now for Cowboy and for Stitzel.

6        Q    That's it?  Only the -- only the vodkas and gins?

7    What did you say, two tequilas and then Cowboy and

8    Stitzel, nothing else?

9        A    There's been a bourbon shortage.  There isn't any

10   bourbon to be had by people who don't make it

11   themselves.

12       Q    I just want to confirm that that's the answer.

13       A    That is the answer.  That's the answer.

14       Q    In your experience in the industry, is selling

15   limited product the standard practice to maintain a

16   trademark?

17       A    What do you mean by "limited product"?

18       Q    Well, you said that you hadn't sold any of these

19   products in the last 10 years except you were getting

20   ready to sell Stitzel and Cowboy.

21       A    No, what I said is I hadn't sold -- I hadn't had

22   supply in the last 10 years.

23       Q    So you had sales?

24       A    We have orders.  We don't -- we have not been

25   able to fulfill the orders.

Exhibit 2

Page 20

1    Q    So I'm not going to see any bill of ladings?  I'm
2    not going to see any invoices where there was payment?
3    I'm not going to see any excise taxes or anything like
4    that --
5    A    You aren't --
6    Q    -- associated with these 25 marks?
7    A    On the ones we could get juice for, you will,
8    yes.
9    Q    And if it's not in the records that have been
10   produced to us, then there haven't been any sales,
11   correct?
12   A    Of which items?  Since I have 25 trademarks,
13   let's go item by item.
14   Q    I'm just telling you that -- let's take Cowboy.
15   A    Okay.
16   Q    If I haven't seen anything by way of excise tax
17   as anything associated with payments to the Federal
18   Government, to the Department of Customs, anything like
19   that, then there haven't been sales; is that a fair
20   statement?
21   A    We are waiting to release Cowboy.
22   Q    In the last 10 years, if you did not produce any
23   documents to us showing any sales in the last ten years
24   either through excise tax payments or through custom
25   records or the TTB records, then can we safely assume

Exhibit 2

Page 21

1   that there weren't any sales in the last 10 to 11 years?

2       A   Excuse me.  You know what?  Yes.  You can safely

3   assume that to the best of my knowledge.

4           MR. ANDRIS:  Keep in mind that your microphone is

5   on, and even if you whisper it's going to be coming

6   through, so we have to go out if you really want to

7   talk.

8           THE DEPONENT:  No, that's okay.

9           MR. ANDRIS:  And a question was pending at that

10  time.  He had asked you a question, and it's technically

11  not proper for you to ask me any questions while it's

12  pending.  Okay?

13          THE DEPONENT:  Okay.  Got it.

14  BY MR. NELSON:

15      Q   And from 2014 -- let's take from the end of 2013

16  back 10 years to -- that would be 2003, you didn't have

17  any pending litigation, correct?  And when I say "you,"

18  I'm talking about Allied Lomar.  Allied Lomar wasn't

19  involved in any litigation between 2003 and the end of

20  2013, were they?

21          MR. ANDRIS:  Regarding trademarks?

22  BY MR. NELSON:

23      Q   Regarding trademarks.

24      A   No, not that I can recall.

25      Q   And you have no plant, correct?  No distillery?

Exhibit 2

Page 22

1    Allied Lomar has no distillery operation?

2        A    Allied Lomar is building distillery right now.

3        Q    Between 2003 and 2015, Allied Lomar had no

4    distillery?

5        A    That is correct.

6        Q    And even as we sit here today, Allied Lomar has

7    no functioning distillery?

8        A    You are correct.

9        Q    All right.  You weren't trying to modernize any

10   plant equipment or anything like that?  That in no way

11   had -- had a basis for you being unable to sell product

12   during the 2003 to the 2016 period?

13       A    Correct.

14       Q    I take it there wasn't any regulatory barriers?

15   Nobody in the Federal Government was saying, "You can't

16   sell this product today"?  And that would be between the

17   time frame of 2003 up until 2015?

18       A    What does 2003 have to do with this?

19       Q    I just need to know that timeframe.  Have you got

20   anything to indicate that the Federal Government or any

21   other state agency was precluding you from selling

22   product between 1995 and 2015?

23       A    I don't think so.

24       Q    And you didn't have any employees' strikes or

25   anything like that that would have precluded Allied

Exhibit 2

Page 23

1    Lomar from selling product between 1995 and 2015?

2       A    Sorry.  Why don't you repeat that.  You're kind

3    of asking a different question now.

4       Q    You had no employee strikes -- there wasn't any

5    labor problems that precluded Allied Lomar from being

6    able to sell bourbon between 1995 and 2015?

7       A    What does 1995 have to do with this?  I'm sorry,

8    I'm not clear.

9       Q    During that timeframe, did you have anything that

10   would have precluded you from selling that product

11   related to labor problems?

12      A    From 1995?  I don't recall.  This is 30 -- how

13   long ago is that?  Twenty years ago?  That I can recall,

14   but...

15      Q    When you purchase your bourbon, do you purchase

16   the bourbon in the barrel or do you purchase the bourbon

17   as what they call juice?

18      A    Juice.

19      Q    All right.  So there wasn't any problems

20   associated with your ability or inability to get barrels

21   that would have precluded from selling the product

22   between 1995 and 2013, correct?

23      A    You're asking two completely separate questions.

24   Let's break it down, okay, please?  1995, tell me about

25   1995.

Page 24

1      Q   I'm giving you the time frame.  My question is
2   going to be from the timeframe of 1995 through 2015.
3      A   So we were 2003 to 2015.  Now we're going to
4   1995, so I'm trying to figure out what you're asking me.
5      Q   During that time frame from 1995 to 2015, there
6   wasn't anything associated with barrels that precluded
7   you from being able to sell bourbon?
8         MR. ANDRIS:  I'm not clear on what you mean,
9   "associated with barrels."
10  BY MR. NELSON:
11     Q   Well, you buy your bourbon you said in juice
12  format, correct?  Do they ship it to you by barrels?
13     A   Excuse me.  Sometimes I buy it in juice format
14  and sometimes I buy it by the barrel.
15     Q   When they sell it to you by juice format, it
16  comes in tanks, correct?
17     A   I -- you know what?  Sometimes yes, sometimes no.
18     Q   Well, was there any barrel shortage that
19  precluded you from being able to sell the bourbon
20  between 1995 and 2015?
21     A   There is a barrel shortage.
22     Q   Did it preclude you from selling product between
23  1995 and 2015?
24     A   In a 20-year period?
25     Q   Any time during that 20-year period.

Exhibit 2

Page 25

1      A    You're asking about two very different eras.   So

2    I understand what you're asking me.   From 1995 to

3    2005 -- let me give you -- well, hold on.   You want my

4    answer?   I'm going to tell you how this works in our

5    business.   1995 to 2005 there was not a barrel shortage.

6    The last 10 years there has been a dramatic bourbon but

7    and whiskey shortage including building up to a barrel

8    shortage.

9      Q    And I'll start asking the questions in two

10   splits.   Between 1995 --

11        THE REPORTER:   I'm sorry.   A little slower for

12   me.   "I'll try to ask the question."   Yes, sir?

13   BY MR. NELSON:

14     Q    In two ways.   Between 1995 and 2005, no barrel

15   shortage, no shortage of bourbon precluded you from

16   selling product?

17     A    False.

18     Q    Between 1995 and 2005?   I thought you just

19   testified that between that 10-year window, 1995 to

20   2005, there wasn't any barrel shortage and there wasn't

21   any bourbon shortage.

22     A    Well, actually, there was a bourbon shortage.   It

23   started probably about 2004, 2005 for us.   We --

24   suppliers that we traditionally had did not have.

25     Q    Then we'll take the time from 1995 to 2003.

Exhibit 2

Exhibit 2

```
                                             Page 26

 1          MR. ANDRIS:  Could we go off the record for 30

 2   seconds while I walk outside with my client for just a

 3   second?

 4          MR. NELSON:  Okay.

 5          THE VIDEOGRAPHER:  Going off the record.  The

 6   time is 8.49 a.m.

 7                         (Off the record from 8:49 a.m. to

 8                         8:51 a.m.)

 9          THE VIDEOGRAPHER:  Back on the record.  The time

10   is 8:51 a.m.

11   BY MR. NELSON:

12      Q   I think your prior testimony, Ms. Palatella, you

13   indicated that you did not have a distillery plant,

14   correct?  Allied Lomar does not have a distillery plant.

15   You said they were in the process of building one,

16   correct?

17      A   Correct.

18      Q   You understand under the law that you cannot take

19   delivery of barrels unless you are a distillery plant,

20   correct?

21      A   Yes, I'm aware of that.

22      Q   So that if you were getting bourbon during this

23   timeframe, it would have had to come to you as juice

24   through a tank, correct?

25          MR. ANDRIS:  What time period are we talking
```

Exhibit 2

Page 27

1    about?

2    BY MR. NELSON:

3       Q    1995 to 2015.  You haven't had a plant at any

4    time during that time frame, have you?

5       A    No, I haven't.

6       Q    So you had to take it in the form of a tank,

7    correct?

8       A    I don't take it personally.

9       Q    I understand.  But to ship it or to have it sent

10   to Allied Lomar, it would have had to come through a

11   tank, correct?

12      A    Incorrect.

13      Q    And I think before we broke, your testimony was,

14   you haven't been able to sell bourbon, or there hasn't

15   been bourbon available, or there's been a barrel

16   shortage from 2004 on; is that correct?

17      A    Let's break that up.  There's been a dramatic

18   bourbon shortage for about the -- from about 2005 to

19   2015.  The barrel shortage happened during that process,

20   but I can't tell you exactly when that began.

21      Q    All right.  So you haven't been able to sell any

22   bourbon product from 2004 basically up until today's

23   date, or 2015, correct?

24      A    Probably 2004.  I don't -- I think we still were

25   able to get a little bit of supply then.

Page 28

1      Q    All right.  Then from the summer of 2004 up until

2    2016, you haven't been able to procure product to sell?

3    And when I say "product," I mean bourbon.

4      A    Why the summer?

5      Q    Well, you said in 2014 you might have got some,

6    so I figured I was going to split the year in half.

7      A    Okay.  Well, I'm not -- I'm not -- I can't really

8    recall the exact date it happened.

9      Q    All right.  So sometime during the 2004 up until

10   2000 -- the end of 2015, you had no bourbon product to

11   sell?  "You" being Allied Lomar.

12     A    Why don't we say 2005 to 2015 we had nothing to

13   sell, yes.

14     Q    All right.  So -- and can we agree that when I

15   say "you," I'm referring to Allied Lomar; I'm not

16   referring to you, personally?  Okay?

17     A    Right, yes.

18     Q    Without giving me the name of the sources, can

19   you tell me now many sources you had for bourbon between

20   the time frame of 1995 up through 2004?

21     A    As it relates to...

22     Q    Bourbon?

23     A    No, is it -- well, as it relates to these -- to

24   Cowboy?

25     Q    Yes.

Page 43

1    A    Incorrect.

2    Q    You have Internet advertising?

3    A    We have a website.

4    Q    If you look at Production No. 82, Request for

5    Production No. 82.

6    A    I believe we have a website up.  82?

7    Q    That's what I was going to ask about, because at

8    the time these were answered -- and we haven't got any

9    supplement to indicate that there were any newspaper,

10   magazine, newsletter, trade journal, website or other

11   media coverage of Cowboy Little Barrel.

12   A    So maybe the website may not be active yet.

13   They've been redoing it, so it may not be up and active.

14   No, when you don't have product actively being sold, you

15   don't advertise it until it's being sold unless you know

16   you's are going to get product.  So now we've been

17   advertising it.

18   Q    No ratings, no awards, nothing associated with

19   Cowboy Little Barrel?

20   A    No juice, no supply, no tasting.

21   Q    Production No. 83, which is on the next page, we

22   asked for information regarding any media agency you

23   hired, and there wasn't anything produced.  Still

24   accurate?  No media company has been hired to assist in

25   marketing Cowboy Little Barrel ever?

Page 80

1    ordered the labels?

2        A    Again, that's confidential.

3        Q    So you believe that you were in the process of

4    getting this product to market at the time that you

5    filed the lawsuit?

6        A    Yes.

7        Q    Do you understand the difference between a

8    blended whiskey and straight bourbon?

9        A    Yes, I do.

10       Q    What are the variances?

11       A    A blended whiskey, that's Kentucky blended

12   whiskey contains a percentage of bourbon and the rest

13   other whiskey material.

14       Q    What is the other whiskey material?

15       A    So are you asking me for my personal brand?

16       Q    What can make up the other -- what can make up

17   the other whiskey material?

18       A    By law?

19       Q    Yes.

20       A    Other grain spirits, aged or not aged.

21       Q    Do they have to be neutral?  Do you know what

22   neutral grain spirit is, a neutral spirit is?

23       A    Yes, I do.

24       Q    Okay.  In your understanding, from a blended

25   whiskey, does it have to be neutral, the other portion?

Page 100

1    Brothers Cowboy Little Barrel straight bourbon

2    or American -- pardon me, Garrison Brothers Cowboy

3    bourbon, straight, and Cowboy Little Barrel straight

4    bourbon.  Nobody ever said there was confusion with

5    those two products, right?

6        A    Incorrect.

7        Q    So you have somebody during the timeframe that

8    you were selling this Cowboy Little Barrel overseas say

9    that they were confused between your overseas product

10   and between what Garrison Brothers were selling here in

11   the United States?

12       A    Garrison Brothers didn't have Cowboy when I was

13   selling it overseas.  They weren't even here.  To the

14   best of my knowledge, I only -- I mean, I only found out

15   about them in 2014.  So I don't know what they were

16   doing prior to that.  I can't imagine there would be

17   confusion if they didn't exist.

18       Q    And you've never had any product since -- or

19   you've never had any blended whiskey product on the

20   shelf here in the United States, correct?

21       A    Not yet.

22       Q    And you haven't had any Cowboy Little Barrel

23   foreign product on a shelf here in the United States,

24   correct?

25       A    Cowboy Little Barrel foreign product here?  I

Exhibit 2

Page 101

1   can't answer that.  I don't know.

2       Q   Well, did you ever sell any Cowboy Little Barrel,

3   the stuff that you had from 1995 up to 2004?  Did you

4   ever sell any of that in the United States?

5       A   No.

6       Q   All right.  So it was never on a shelf in the

7   United States, Cowboy Little Barrel that you sold

8   overseas, and the Cowboy Little Barrel blended whiskey

9   has never been on the shelf here in the United States,

10  correct?

11      A   To this very date?  Correct.

12      Q   So no retailer, no client, no consumer, no

13  restaurants called you up and said they were confused

14  between Cowboy Little Barrel blended whiskey and

15  Garrison Brothers straight bourbon ever?

16      A   I think there's huge confusion in the market.

17      Q   No one's called you and said there was confusion?

18      A   Yes, they have called me.

19      Q   How many people have called you?  I don't need

20  the names right now, but how many have called you?

21      A   I've had discussions with people who think there

22  is clear confusion between someone who used to be

23  Garrison this big and Cowboy this big, and now it's the

24  reverse.  Believe me, it was brought to my attention.

25      Q   Well, you said -- you just said "Cowboy this big

Exhibit 2

Page 128

1      A    We didn't have product.  There wasn't any

2  available.

3      Q    Did you make any declarations stating that there

4  wasn't any product available in 2009?

5      A    No.  We were using it.  We were using the mark in

6  commerce.  That's what this says here.  "Did you use the

7  mark in commerce?"  We did use it in commerce.

8      Q    But you had nothing to sell, correct?

9      A    We didn't know when we'd have product to sell,

10 but I assumed it would be any time because we have very

11 good relationships.

12     Q    Then let me ask you this:  How were you using the

13 product in commerce?

14     A    We were promoting it.  It was on our price list.

15 It was something discussed in meetings.  It was a

16 product that we advertised, and if you want to ask me

17 more, the wonderful Mr. Garrison needs to leave the

18 room.  Sorry to him.

19     Q    So basically your answer is, it's in commerce

20 because you were promoting a product that you couldn't

21 sell but you hoped one day to be able to sell.

22     A    Not one day.  I thought that it would be

23 imminent.  I thought that we would have product in

24 the -- you know, there would be product any day.  There

25 always was.

Exhibit 2

Page 155

1          MR. ANDRIS:  We're getting pretty close, Counsel.

2          MR. NELSON:  Yeah, we're out of here.  And we're

3     just recessing.

4          THE VIDEOGRAPHER:  This concludes today's

5     videotaped deposition of Allied Lomar Inc. pursuant to

6     Rule 30B6.  We're off the record at 12:13 p.m.  Thank

7     you. Please take off the microphones.

8          THE REPORTER:  Could I just ask, do you need a

9     copy, sir?

10          MR. ANDRIS:  Yes, please.

11

12

13               (TIME NOTED: 12:12 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 2

Page 157

1        I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4           That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were administered an oath; that

8     a record of the proceedings was made by me using

9     machine shorthand which was thereafter transcribed

10    under my direction; that the foregoing transcript is

11    a true record of the testimony given.

12           Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript [ ] was [ ] was not requested.

16        I further certify I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or any party to this action.

19        IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21

22    Dated:

23    _____

24          JOANNA BROADWELL

25          CSR No. 10959

# EXHIBIT 3

# UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| **SERIAL NO.**          **APPLICANT**<br>78/047390 Allied Lomar, Inc. | **PAPER NO.** |
| **MARK**<br>COWBOY LITTLE BARREL | **Commissioner for Trademarks**<br>2900 Crystal Drive<br>Arlington, VA 22202-3513<br>www.uspto.gov |
| **ADDRESS**<br>MARTIN F MAJESTIC<br>FINNEGAN HENDERSON FARABOW ET AL<br>1300 I ST NW<br>WASHINGTON DC  20005-3315 | If no fees are enclosed, the address should include the words "Box Responses - No Fee." |

| | |
|---|---|
| **ACTION NO.**<br>02 | |
| **MAILING DATE**<br>04/30/02 | Please provide in all correspondence: |
| **REF. NO.**<br>08587.0002 | 1. Filing Date, serial number, mark and Applicant's name.<br>2. Mailing date of this action.<br>3. Examining Attorney's name and Law Office number.<br>4. Your telephone number and ZIP code. |

FORM PTO-1525 (5-90)          U.S. DEPT. OF COMM. & TM OFFICE

RE: Serial Number: 78/047390

☑ The examining attorney has searched the Office records and has found no similar registered mark which would bar registration under Trademark Act Section 2(d), 15 U.S.C. Section 1052(d). TMEP section 704.02.

☐ 1. Action on this application is suspended pending the disposition of:

☐ Cancellation No(s).

☐ Opposition No(s).

☐ Civil Action No(s).

☐ Concurrent Use No(s).

If the applicant is a party to the above proceeding, the applicant should advise the Examining Attorney of the outcome of the proceeding when it is terminated.

☑ Application Serial No(s). 76-090172 and 75-680188.

Since applicant's effective filing date is subsequent to the effective filing date of the above-identified application(s), the latter, if and when it registers, may be cited against this application. See 37 C.F.R. §2.83. A copy of information relevant to this pending application(s) ☐ is attached ☐ was sent previously.

The applicant may request that the application be removed from suspension by presenting arguments related to the potential conflict between the relevant applications or other arguments related to the ground for suspension. The applicant's election to present or not to present arguments at this time will not affect the applicant's right to present arguments later.

☐ 2. Action on this application is suspended pending receipt of a certification or certified copy of the registration in the country of origin of applicant.
If the registration is in a foreign language, an English translation must be submitted. The certification or certified copy of the registration should be forwarded to the Examining Attorney as soon as possible.  If the foreign application is abandoned, the Examining Attorney should be advised.

☐ 3. It is noted that an assignment involving this application is presently pending before the Office. Action is suspended on this application pending recordation of the assignment.  This application will be removed from suspended status upon recordation of the assignment. Notification of recordation is normally done through Office channels. However, upon receipt of the reel and frame number of the assignment, applicant should advise the Examining Attorney. See 37 C.F.R. Part 3.

☐ 4. Action on this application is suspended for ^ months until the Examining Attorney can determine whether the cited registration will be canceled under §8 or expire under §9. 37 C.F.R. 2.67.

☐ 5. The Following refusals/requirements are continued.

Tracy Whittaker-Brown
EXAMINING ATTORNEY NAME

EXAMINING ATTORNEY SIGNATURE

111
LAW OFFICE

(703) 308-9111, ext. 167
PHONE

Form **PTOL-373** (Rev. 8-94)

Exhibit 3 - Page 1 of 5

ALLIED 00000167

TRAMII GENERAL QUERY AS OF: 06/10/03    15:08:44

SERIAL NUMBER: 75680188          FILING DATE: 05/03/1999
REG. NUMBER: 0000000             REG. DATE:
REGISTER: PRINCIPAL              MARK TYPE: TRADEMARK
FILED USE: NO       CURRENTLY USE: NO          AMENDED USE: NO
FILED ITU: YES      CURRENTLY ITU: YES         AMENDED ITU: NO
FILED 44D: NO       CURRENTLY 44D: NO          AMENDED 44D: NO
FILED 44E: NO       CURRENTLY 44E: NO          AMENDED 44E: NO

EXAMINER: 75598-EHARD, ANDREW                           EXMR LO: 101
LO ASSIGNED:    101
LOCATION:   900-FILE REPOSITORY (FRANCONIA)
DATE IN LOC:    11/08/2002
CHRG TO LOC:    NONE
CHRG TO:   NONE
STATUS:   606 - ABANDONED - NO STATEMENT OF USE FILED
STATUS DATE:    08/29/2002
A/R EXAMINER:      NO A/R EXAMINER ASSIGNED

PUB DATE: 06/06/2000       DATE ABANDONED: 08/29/2002      DATE CANCELLED:
SECTION 8: NO              SECTION 15: NO                  ASSIGNMENT: NO
RENEWAL FILED: NO          RENEWAL DATE:                   DATE AMENDED REG:
CLASSES ACTIVE:    01

MARK:      COWBOY WHISKEY

CURRENT OWNER INFORMATION
PARTY TYPE:    20-OWNER AT PUBLICATION - FIRST NAME
NAME:          Small, Stephen Bradley
ADDRESS:       Box 414678
               KANSAS CITY MISSOURI 641414678
ENTITY:        01-INDIVIDUAL
CITIZENSHIP:   UNITED STATES

GOODS AND SERVICES
The following symbols indicate that the goods and services have been amended after registration of the Mark.
        Double parenthesis ((..)) identify any "less goods";
        Single brackets [..] indicate deleted goods; and,
        Single asterisks *..* identify additional (new) wording in the goods.
FOR:   Alcoholic beverages, namely, whiskey
       INT. CLASS 033 (U.S. CLASSES 047 AND 049)
       70FIRST USE        USE IN COMMERCE         CLASS STATUS: 6

MISCELLANEOUS INFORMATION / STATEMENTS

SECTION 2F: NO                    SECTION 2F IN PART:  NO
DISCLAIMER WITH PREDETERMINED TEXT:
      "WHISKEY"

PROSECUTION HISTORY

| DATE | ENT CD | ENT TYPE | DESCRIPTION | ENT NUM | PRCD NUM |
|------|--------|----------|-------------|---------|----------|
| 11/07/02 | ABN6 | S | ABANDONMENT - NO USE STATEMENT FILED | 016 | 000000 |
| 03/25/02 | MAIL | I | PAPER RECEIVED | 015 | 000000 |
| 03/22/02 | MAIL | I | PAPER RECEIVED | 014 | 000000 |
| 03/12/02 | EX3G | S | EXTENSION 3 GRANTED | 013 | 000000 |
| 02/28/02 | EXT3 | S | EXTENSION 3 FILED | 012 | 000000 |
| 09/04/01 | EX2G | S | EXTENSION 2 GRANTED | 011 | 000000 |
| 08/27/01 | EXT2 | S | EXTENSION 2 FILED | 010 | 000000 |
| 04/04/01 | EX1G | S | EXTENSION 1 GRANTED | 009 | 000000 |

Page: 1

Exhibit 3 - Page 2 of 5

ALLIED 00000165

*** User: twhittaker   *   Serial Number: 76090172   ** 6/22/01 1:05:48 PM *

# BARREL / LITTLE BATCH

Mark
    BARREL / LITTLE BATCH

Pseudo Mark
    BARREL LITTLE BATCH

Goods and Services
    IC 033. US 047 049. G & S: ALCOHOLIC BEVERAGES, NAMELY, DISTILLED
    SPIRITS

Mark Drawing Code
    (1) TYPED DRAWING

Serial Number
    76090172

Filing Date
    July 17, 2000

Filed ITU
    FILED AS ITU

Owner Name and Address
    (APPLICANT) OLDE ST. NICK DISTILLERY, INC. CORPORATION CALIFORNIA 330
    PRIMROSE ROAD SUITE 512 BURLINGAME CALIFORNIA 94010

Type of Mark
    TRADEMARK

Register
    PRINCIPAL

Live Dead Indicator
    LIVE

*** Search: 10 *** Document Number: 2 ***

Exhibit 3 - Page 3 of 5

ALLIED 00000171

# UNITED STATES PATENT AND TRADEMARK OFFICE

| | PAPER NO. |
|---|---|
| **SERIAL NO.**   **APPLICANT**<br>78/047390 Allied Lomar, Inc. | |

| **MARK**<br>COWBOY LITTLE BARREL | | | **ADDRESS:** |
|---|---|---|---|
| **ADDRESS**<br>Allied Lomar, Inc.<br>330 Primrose Road, Suite 512<br>Burlingame CA 94010 | **ACTION NO.**<br>01 | | **Commissioner for Trademarks**<br>2900 Crystal Drive<br>Arlington, VA 22202-3513<br>www.uspto.gov |
| | **MAILING DATE**<br>06/25/01 | | If no fees are enclosed, the address should include the words "Box Responses - No Fee." |
| | **REF. NO.** | | |

| | | Please provide in all correspondence: |
|---|---|---|
| FORM PTO-1525 (5-90) | U.S. DEPT. OF COMM. PAT. & TM OFFICE | 1. Filing Date, serial number, mark and Applicant's name.<br>2. Mailing date of this Office action.<br>3. Examining Attorney's name and Law Office number.<br>4. Your telephone number and ZIP code. |

**A PROPER RESPONSE TO THIS OFFICE ACTION MUST BE RECEIVED WITHIN 6 MONTHS FROM THE DATE OF THIS ACTION IN ORDER TO AVOID** *ABANDONMENT.* *For your convenience and to ensure proper handling of your response, a label has been enclosed. Please attach it to the upper right corner of your response. If the label is not enclosed, print or type the* Trademark Law Office No., Serial No., *and* Mark *in the upper right corner of your response.*

RE: Serial Number: 78/047390

The assigned examining attorney has reviewed the referenced application and determined the following.

Prior Pending Applications

Although the examining attorney has searched the Office records and has found no similar *registered* mark which would bar registration under Trademark Act Section 2(d), 15 U.S.C. Section 1052(d), the examining attorney encloses information regarding pending Application Serial Nos. 76-090172 and 75-680188.  37 C.F.R. Section 2.83.

There may be a likelihood of confusion between the applicant's mark and the mark in the above noted application under Section 2(d) of the Act.  The filing date of the referenced application precedes the applicant's filing date.  If the earlier-filed application matures into a registration, the examining attorney may refuse registration under Section 2(d).

If the applicant believes that there is no potential conflict between this application and the earlier-filed application, the applicant may present arguments relevant to the issue in a request to remove the application from suspension.  The election to file or not to file such a request at this time in no way limits the applicant's right to address this issue at a later point.

Exhibit 3 - Page 4 of 5

ALLIED 00000169

Commissioner for Trademarks
2900 Crystal Drive
Arlington , VA  22202-3513
www.uspto.gov

Jul 16, 2003

## NOTICE OF PUBLICATION UNDER 12(a)

1.  Serial No.:
    78/047,390

2.  Mark:
    COWBOY LITTLE BARREL

3.  International Class(es):
    33

4.  Publication Date:
    Aug 5, 2003

5.  Applicant:
    Allied Lomar, Inc.

The mark of the application identified appears to be entitled to registration. The mark will, in accordance with Section 12(a) of the Trademark Act of 1946, as amended, be published in the Official Gazette on the date indicated above for the purpose of opposition by any person who believes he will be damaged by the registration of the mark. If no opposition is filed within the time specified by Section 13(a) of the Statute or by rules 2.101 or 2.102 of the Trademark Rules, the Commissioner of Patents and Trademarks may issue a certificate of registration.

Copies of the trademark portion of the Official Gazette containing the publication of the mark may be obtained from:

The Superintendent of Documents
U.S. Government Printing Office
PO Box 371954
Pittsburgh, PA 15250-7954
Phone: (202) 512-1800

By direction of the Commissioner.

Correspondence Address:

MARTIN F MAJESTIC
FINNEGAN HENDERSON FARABOW ET AL
1300 I ST NW
WASHINGTON DC 20005-3315

TMP&I

Exhibit 3 - Page 5 of 5

ALLIED 00000186

# EXHIBIT 4

Generated on: This page was generated by TSDR on 2014-07-08 15:21:02 EDT
Mark: COWBOY LITTLE BARREL

| | | | |
|---|---|---|---|
| **US Serial Number:** 78047390 | | **Application Filing Date:** Feb. 08, 2001 | |
| **US Registration Number:** 2777811 | | **Registration Date:** Oct. 28, 2003 | |
| **Register:** Principal | | | |
| **Mark Type:** Trademark | | | |
| **Status:** The registration has been renewed. | | | |
| **Status Date:** Oct. 09, 2013 | | | |
| **Publication Date:** Aug. 05, 2003 | | | |

## Mark Information

**Mark Literal Elements:** COWBOY LITTLE BARREL
**Standard Character Claim:** No
**Mark Drawing Type:** 1 - TYPESET WORD(S) /LETTER(S) /NUMBER(S)

## Goods and Services

Note: The following symbols indicate that the registrant/owner has amended the goods/services:

- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**For:** Bourbon Whiskey
**International Class(es):** 033 - Primary Class          **U.S Class(es):** 047, 049
**Class Status:** ACTIVE
**Basis:** 1(a)
**First Use:** Aug. 31, 1995          **Use in Commerce:** Aug. 31, 1995

## Basis Information (Case Level)

| | | |
|---|---|---|
| **Filed Use:** Yes | **Currently Use:** Yes | **Amended Use:** No |
| **Filed ITU:** No | **Currently ITU:** No | **Amended ITU:** No |
| **Filed 44D:** No | **Currently 44D:** No | **Amended 44D:** No |
| **Filed 44E:** No | **Currently 44E:** No | **Amended 44E:** No |
| **Filed 66A:** No | **Currently 66A:** No | |
| **Filed No Basis:** No | **Currently No Basis:** No | |

## Current Owner(s) Information

**Owner Name:** Allied Lomar, Inc.
**Owner Address:** 401 California Drive
Burlingame, CALIFORNIA 94010
UNITED STATES
**Legal Entity Type:** CORPORATION          **State or Country Where Organized:** CALIFORNIA

## Attorney/Correspondence Information

**Attorney of Record**

**Attorney Name:** Barbara L. Friedman          **Docket Number:** 27251.1
**Attorney Primary Email** ipfilings@hansonbridgett.com          **Attorney Email** Yes

Exhibit 4 - Page 1 of 4

ALLIED 00000130

| Address: | Authorized: |
|---|---|

### Correspondent

| | |
|---|---|
| Correspondent Name/Address: | Allied Lomar, Inc.<br>401 California Drive<br>Burlingame, CALIFORNIA 94010<br>UNITED STATES |
| Phone: | 650-696-1700 |
| Fax: | 650-342-9003 |
| Correspondent e-mail: | julie@inbeverage.com |
| Correspondent e-mail Authorized: | Yes |

### Domestic Representative - Not Found

## Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Oct. 09, 2013 | NOTICE OF ACCEPTANCE OF SEC. 8 & 9 - E-MAILED | |
| Oct. 09, 2013 | REGISTERED AND RENEWED (FIRST RENEWAL - 10 YRS) | 76533 |
| Oct. 09, 2013 | REGISTERED - SEC. 8 (10-YR) ACCEPTED/SEC. 9 GRANTED | 76533 |
| Oct. 07, 2013 | REGISTERED - COMBINED SECTION 8 (10-YR) & SEC. 9 FILED | 76533 |
| Oct. 09, 2013 | CASE ASSIGNED TO POST REGISTRATION PARALEGAL | 76533 |
| Oct. 07, 2013 | TEAS SECTION 8 & 9 RECEIVED | |
| Oct. 07, 2013 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Jun. 03, 2013 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Nov. 05, 2009 | REGISTERED - SEC. 8 (6-YR) ACCEPTED & SEC. 15 ACK. | 64591 |
| Nov. 04, 2009 | CASE ASSIGNED TO POST REGISTRATION PARALEGAL | 64591 |
| Oct. 26, 2009 | TEAS SECTION 8 & 15 RECEIVED | |
| Jul. 31, 2008 | CASE FILE IN TICRS | |
| Feb. 20, 2007 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Oct. 28, 2003 | REGISTERED-PRINCIPAL REGISTER | |
| Aug. 05, 2003 | PUBLISHED FOR OPPOSITION | |
| Jul. 16, 2003 | NOTICE OF PUBLICATION | |
| Jun. 10, 2003 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Apr. 30, 2002 | LETTER OF SUSPENSION MAILED | |
| Dec. 26, 2001 | CORRESPONDENCE RECEIVED IN LAW OFFICE | |
| Jun. 25, 2001 | NON-FINAL ACTION MAILED | |
| Jun. 22, 2001 | ASSIGNED TO EXAMINER | 74672 |

## Maintenance Filings or Post Registration Information

| | |
|---|---|
| Affidavit of Continued Use: | Section 8 - Accepted |
| Affidavit of Incontestability: | Section 15 - Accepted |
| Renewal Date: | Oct. 28, 2013 |

## TM Staff and Location Information

### TM Staff Information - None

### File Location

| | | | |
|---|---|---|---|
| Current Location: | GENERIC WEB UPDATE | Date in Location: | Oct. 09, 2013 |

Exhibit 4 - Page 2 of 4

ALLIED 00000131

Exhibit 4 - Page 3 of 4

| | |
|---|---|
| **From:** | TMOfficialNotices@USPTO.GOV |
| **Sent:** | Wednesday, October 9, 2013 11:02 PM |
| **To:** | julie@inbeverage.com |
| **Subject:** | Trademark RN 2777811: Official Notice of Acceptance and Renewal under Sections 8 and 9 of the Trademark Act |

**Serial Number:** 78047390
**Registration Number:** 2777811
**Registration Date:** Oct 28, 2003
**Mark:** COWBOY LITTLE BARREL
**Owner:** Allied Lomar, Inc.

Oct 9, 2013

## NOTICE OF ACCEPTANCE UNDER SECTION 8

The declaration of use or excusable nonuse filed for the above-identified registration meets the requirements of Section 8 of the Trademark Act, 15 U.S.C. §1058. **The Section 8 declaration is accepted.**

## NOTICE OF REGISTRATION RENEWAL UNDER SECTION 9

The renewal application filed for the above-identified registration meets the requirements of Section 9 of the Trademark Act, 15 U.S.C. §1059. **The registration is renewed.**

**The registration will remain in force for the class(es) listed below for the remainder of the ten-year period, calculated from the registration date, unless canceled by an order of the Commissioner for Trademarks or a Federal Court.**

**Class(es):**
033

TRADEMARK SPECIALIST
POST-REGISTRATION DIVISION
571-272-9500

### REQUIREMENTS FOR MAINTAINING REGISTRATION IN SUCCESSIVE TEN-YEAR PERIODS

**WARNING: Your registration will be canceled if you do not file the documents below during the specified time periods.**

**What and When to File:** You must file a declaration of use (or excusable nonuse) **and** an application for renewal between every 9th and 10th-year period, calculated from the registration date.  See 15 U.S.C. §§1058, 1059.

**Grace Period Filings**

The above documents will be considered as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*\*\*The USPTO WILL NOT SEND ANY FURTHER NOTICE OR REMINDER OF THESE REQUIREMENTS.  THE**

Exhibit 4 - Page 3 of 4

ALLIED 00000132

**REGISTRANT SHOULD CONTACT THE USPTO ONE YEAR BEFORE THE EXPIRATION OF THE TIME PERIODS SHOWN ABOVE TO DETERMINE APPROPRIATE REQUIREMENTS AND FEES.\*\*\***

To view this notice and other documents for this application on-line, go to  http://tdr.uspto.gov/search.action?sn=78047390.
 NOTE: This notice will only be available on-line the next business day after receipt of this e-mail.

Exhibit 4 - Page 4 of 4

ALLIED 00000133

# EXHIBIT 5

# Combined Declaration of Use and Incontestability under Sections 8 & 15

The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **REGISTRATION NUMBER** | 2777811 |
| **REGISTRATION DATE** | 10/28/2003 |
| **SERIAL NUMBER** | 78047390 |
| **MARK SECTION** | |
| MARK | COWBOY LITTLE BARREL |
| **OWNER SECTION (current)** | |
| NAME | Allied Lomar, Inc. |
| STREET | 330 Primrose Road, Suite 512 |
| CITY | Burlingame |
| STATE | California |
| ZIP/POSTAL CODE | 94010 |
| COUNTRY | United States |
| **OWNER SECTION (proposed)** | |
| NAME | Allied Lomar, Inc. |
| STREET | 1199 Howard Avenue, Suite 350 |
| CITY | Burlingame |
| STATE | California |
| ZIP/POSTAL CODE | 94010 |
| COUNTRY | United States |
| **ATTORNEY SECTION (current)** | |
| NAME | MARTIN F MAJESTIC |
| FIRM NAME | HANSON BRIDGETT MARCUS VLAHOS & RUDY, LL |
| STREET | 425 MARKET STREET, 26TH FLOOR |
| CITY | SAN FRANCISCO |
| STATE | California |
| POSTAL CODE | 94105 |
| COUNTRY | United States |
| PHONE | (415) 995-5891 |
| FAX | (415) 541-9366 |
| EMAIL | ipfilings@hansonbridgett.com |
| **ATTORNEY SECTION (proposed)** | |

6-16-16
Δ π EXHIBIT    6
Deponent Palatella
Date _____ Rptr_____
J. Bradwell
WWW.DEPOBOOK.COM

Exhibit 5 - Page 1 of 5

| NAME | Barbara L. Friedman |
|---|---|
| FIRM NAME | Hanson Bridgett LLP |
| STREET | 425 MARKET STREET, 26TH FLOOR |
| CITY | SAN FRANCISCO |
| STATE | California |
| POSTAL CODE | 94105 |
| COUNTRY | United States |
| PHONE | (415) 995-5891 |
| FAX | (415) 541-9366 |
| EMAIL | ipfilings@hansonbridgett.com |
| AUTHORIZED TO COMMUNICATE VIA E-MAIL | Yes |
| ATTORNEY DOCKET NUMBER | 27251.1 |
| OTHER APPOINTED ATTORNEY | Susan G. O'Neill, Garner K. Weng, Arman Javid |

### GOODS AND/OR SERVICES SECTION

| INTERNATIONAL CLASS | 033 |
|---|---|
| GOODS OR SERVICES | KEEP ALL LISTED |
| SPECIMEN FILE NAME(S) | \\TICRS\EXPORT8\IMAGEOUT8 \780\473\78047390\xml1\81 50002.JPG |
| SPECIMEN DESCRIPTION | product label |

### PAYMENT SECTION

| NUMBER OF CLASSES | 1 |
|---|---|
| NUMBER OF CLASSES PAID | 1 |
| SUBTOTAL AMOUNT | 300 |
| TOTAL FEE PAID | 300 |

### SIGNATURE SECTION

| SIGNATURE | /mp/ |
|---|---|
| SIGNATORY'S NAME | Marci Palatella |
| SIGNATORY'S POSITION | President |
| DATE SIGNED | 10/26/2009 |
| PAYMENT METHOD | DA |

| FILING INFORMATION | |
|---|---|
| SUBMIT DATE | Mon Oct 26 12:49:59 EDT 2009 |
| TEAS STAMP | USPTO/S08N15-XX.XXX.XXX.X XX-20091026124959177290-2 777811-4601eb54e51e6a2bcf 494860cc7327941a-DA-8427- 20091023195502112335 |

Exhibit 5 - Page 2 of 5

ATTORNEY/DOCKET/REFERENCE
GENERAL INFORMATION SERVICES

### Combined Declaration of Use and Incontestability under Sections 8 & 15
**To the Commissioner for Trademarks:**

**REGISTRATION NUMBER:** 2777811
**REGISTRATION DATE:** 10/28/2003

**MARK:** COWBOY LITTLE BARREL

The owner, Allied Lomar, Inc., having an address of
    1199 Howard Avenue, Suite 350
    Burlingame, California 94010
    United States
is filing a Combined Declaration of Use and Incontestability under Sections 8 & 15.

For International Class 033, the mark is in use in commerce on or in connection with **all** of the goods or services listed in the existing registration for this specific class; **and** the mark has been continuously used in commerce for five (5) consecutive years after the date of registration, or the date of publication under Section 12(c), and is still in use in commerce on or in connection with **all** goods or services listed in the existing registration for this class. Also, no final decision adverse to the owner's claim of ownership of such mark for those goods or services exists, or to the owner's right to register the same or to keep the same on the register; and, no proceeding involving said rights pending and not disposed of in either the U.S. Patent and Trademark Office or the courts exists.

The owner is submitting one specimen for this class showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) product label.
Specimen File1

The registrant hereby appoints Barbara L. Friedman and Susan G. O'Neill, Garner K. Weng, Arman Javid of  Hanson Bridgett LLP
    425 MARKET STREET, 26TH FLOOR
    SAN FRANCISCO, California 94105
     United States
to file this Combined Declaration of Use and Incontestability under Sections 8 & 15 on behalf of the registrant.  The attorney docket/reference number is 27251.1.

A fee payment in the amount of $300 will be submitted with the form, representing payment for 1 class(es), plus any additional grace period fee, if necessary.

### Declaration

*The mark is in use in commerce on or in connection with the goods and/or services identified above, as evidenced by the attached specimen(s) showing the mark as used in commerce. The mark has been in continuous use in commerce for five (5) consecutive years after the date of registration, or the date of publication under Section 12(c), and is still in use in commerce. There has been no final decision adverse to the owner's claim of ownership of such mark, or to the owner's right to register the same or to keep the same on the register; and there is no proceeding involving said rights pending and not disposed of either in the U.S. Patent and Trademark Office or in the courts.*

The undersigned being hereby warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements and the like may jeopardize the validity of this document, declares that he/she is properly authorized to execute this document on behalf of the Owner; and all statements made of his/her own knowledge are true and that all statements made on information and belief are believed to be true.

Signature: /mp/     Date: 10/26/2009
Signatory's Name: Marci Palatella
Signatory's Position: President

Mailing Address **(current):**
  HANSON BRIDGETT MARCUS VLAHOS & RUDY, LL

Exhibit 5 - Page 3 of 5

425 MARKET STREET, 26TH FLOOR
SAN FRANCISCO, California 94105

Mailing Address **(proposed):**
 Hanson Bridgett LLP
 425 MARKET STREET, 26TH FLOOR
 SAN FRANCISCO, California 94105

Serial Number: 78047390
Internet Transmission Date: Mon Oct 26 12:49:59 EDT 2009
TEAS Stamp: USPTO/S08N15-XX.XXX.XXX.XXX-200910261249
59177290-2777811-4601eb54e51e6a2bcf49486
0cc7327941a-DA-8427-20091023195502112335

Exhibit 5 - Page 4 of 5



Exhibit 5 - Page 5 of 5

**EXHIBIT 6**

PTO Form 1583 (Rev 5/2006)
OMB No. 0651-0055 (Exp 07/31/2008)

# Combined Declaration of Use and/or Excusable Nonuse/Application for Renewal of Registration of a Mark under Sections 8 & 9

### The table below presents the data as entered.

| Input Field | Entered |
|---|---|
| **REGISTRATION NUMBER** | 2777811 |
| **REGISTRATION DATE** | 10/28/2003 |
| **SERIAL NUMBER** | 78047390 |
| **MARK SECTION** | |
| MARK | COWBOY LITTLE BARREL |
| **CORRESPONDENCE SECTION (current)** | |
| NAME | Barbara L. Friedman |
| FIRM NAME | Allied Lomar, Inc. |
| INTERNAL ADDRESS | Suite 350 |
| STREET | 1199 Howard Avenue |
| CITY | Burlingame |
| STATE | California |
| POSTAL CODE | 94010 |
| COUNTRY | United States |
| PHONE | (65) 696-1700 |
| FAX | (650) 342-9003 |
| EMAIL | julie@inbeverage.com;marci@inbeverage.com |
| AUTHORIZED TO COMMUNICATE VIA E-MAIL | Yes |
| DOCKET/REFERENCE NUMBER | 27251.1 |
| **CORRESPONDENCE SECTION (proposed)** | |
| NAME | Allied Lomar, Inc. |
| STREET | 401 California Drive |
| CITY | Burlingame |
| STATE | California |
| POSTAL CODE | 94010 |
| COUNTRY | United States |
| PHONE | 650-696-1700 |
| FAX | 650-342-9003 |
| EMAIL | julie@inbeverage.com |
| AUTHORIZED TO COMMUNICATE VIA E-MAIL | Yes |

Δ π EXHIBIT 7

Deponent_____

Date_____ Rptr._____
WWW.DEPOBOOK.COM

Exhibit 6 - Page 1 of 6

## GOODS AND/OR SERVICES SECTION

| | |
|---|---|
| INTERNATIONAL CLASS | 033 |
| GOODS OR SERVICES | Bourbon Whiskey |
| SPECIMEN FILE NAME(S) | \\TICRS\EXPORT16\IMAGEOUT 16\780\473\78047390\xml3\S890002.JPG |
| SPECIMEN DESCRIPTION | Digital photograph showing mark applied to labels. |

## OWNER SECTION (current)

| | |
|---|---|
| NAME | Allied Lomar, Inc. |
| STREET | Suite 350 |
| CITY | Burlingame |
| STATE | California |
| ZIP/POSTAL CODE | 94010 |
| COUNTRY | United States |

## OWNER SECTION (proposed)

| | |
|---|---|
| NAME | Allied Lomar, Inc. |
| STREET | 401 California Drive |
| CITY | Burlingame |
| STATE | California |
| ZIP/POSTAL CODE | 94010 |
| COUNTRY | United States |
| PHONE | 650-696-1700 |
| FAX | 650-342-9003 |
| EMAIL | julie@inbeverage.com |
| AUTHORIZED TO COMMUNICATE VIA E-MAIL | Yes |

## LEGAL ENTITY SECTION (current)

| | |
|---|---|
| TYPE | corporation |
| STATE/COUNTRY OF INCORPORATION | California |

## PAYMENT SECTION

| | |
|---|---|
| NUMBER OF CLASSES | 1 |
| NUMBER OF CLASSES PAID | 1 |
| SUBTOTAL AMOUNT | 500 |
| TOTAL FEE PAID | 500 |

## SIGNATURE SECTION

| | |
|---|---|
| SIGNATURE | /mp/ |
| SIGNATORY'S NAME | Marci Palatella |
| SIGNATORY'S POSITION | President |
| DATE SIGNED | 10/07/2013 |
| SIGNATORY'S PHONE NUMBER | 650-696-1700 |

Exhibit 6 - Page 2 of 6

| PAYMENT METHOD | CC |
|---|---|
| | **FILING INFORMATION** |
| SUBMIT DATE | Mon Oct 07 19:01:41 EDT 2013 |
| TEAS STAMP | USPTO/S08N09-XXX.XXX.XX.X<br>XX-20131007190141363891-2<br>777811-5004686fbb94b97b88<br>f0b06ac378e5bb76e19762473<br>b423055f87723597b2e7d81-C<br>C-5579-201310071842184695<br>43 |

Exhibit 6 - Page 3 of 6

PTO Form 1963 (Rev 9/2008)
OMB No. 0651-0055 (Exp 07/31/2016)

## Combined Declaration of Use and/or Excusable Nonuse/Application for Renewal of Registration of a Mark under Sections 8 & 9

### To the Commissioner for Trademarks:

**REGISTRATION NUMBER:** 2777811
**REGISTRATION DATE:** 10/28/2003

**MARK:** COWBOY LITTLE BARREL

The owner, Allied Lomar, Inc., a corporation of California, having an address of
    401 California Drive
    Burlingame, California 94010
    United States
is filing a Combined Declaration of Use and/or Excusable Nonuse/Application for Renewal of Registration of a Mark under Sections 8 & 9.

For International Class 033, the mark is in use in commerce on or in connection with **all** goods/services, or to indicate membership in the collective membership organization, listed in the existing registration for this specific class: Bourbon Whiskey ; or, the owner is making the listed excusable nonuse claim.

The owner is submitting one(or more) specimen(s) showing the mark as used in commerce on or in connection with any item in this class, consisting of a(n) Digital photograph showing mark applied to labels..
Specimen File1
The registrant's current Correspondence Information: Barbara L. Friedman of Allied Lomar, Inc.
    Suite 350
    1199 Howard Avenue
    Burlingame, California (CA) 94010
    United States
The docket/reference number is 27251.1.

The registrant's proposed Correspondence Information: Allied Lomar, Inc.
    401 California Drive
    Burlingame, California (CA) 94010
    United States

The phone number is 650-696-1700.

The fax number is 650-342-9003.

The email address is julie@inbeverage.com.

A fee payment in the amount of $500 will be submitted with the form, representing payment for 1 class(es), plus any additional grace period fee, if necessary.

### Declaration

#### Section 8: Declaration of Use and/or Excusable Nonuse in Commerce
*Unless the owner has specifically claimed excusable nonuse, the mark is in use in commerce on or in connection with the goods and/or services identified above, as evidenced by the attached specimen(s) showing the mark as used in commerce.*

The undersigned being hereby warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements and the like may jeopardize the validity of this document, declares that he/she is properly authorized to execute this document on behalf of the Owner; and all statements made of his/her own knowledge are true and that all statements

Exhibit 6 - Page 4 of 6

made on information and belief are believed to be true.

**Section 9: Application for Renewal**
*The registrant requests that the registration be renewed for the goods/services/collective organization identified above.*


Signature: /mp/     Date: 10/07/2013
Signatory's Name: Marci Palatella
Signatory's Position: President
Signatory's Phone Number: 650-696-1700

Serial Number: 78047390
Internet Transmission Date: Mon Oct 07 19:01:41 EDT 2013
TEAS Stamp: USPTO/S08N09-XXX.XXX.XX.XXX-201310071901
41363891-2777811-5004686fbb94b97b88f0b06
ac378e5bb76e19762473b423055f87723597b2e7
d81-CC-5579-20131007184218469543

Exhibit 6 - Page 5 of 6



Exhibit 6 - Page 6 of 6